[Cite as *In re X.B.*, 2016-Ohio-5805.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re [X.B.], | : | |
| [C.C.], | : | No. 16AP-243 |
| Plaintiff-Appellee, | : | (C.P.C. No. 14JU-758) |
| v. | : | (ACCELERATED CALENDAR) |
| [L.B.], | : | |
| Defendant-Appellee, | : | |
| [A.B.], | : | |
| Third-Party Defendant/Appellant. | : | |
| | : | |
| In re [Z.L.], | : | |
| [C.C.], | : | No. 16AP-277 |
| Plaintiff-Appellee, | : | (C.P.C. No. 14JU-10514) |
| v. | : | (ACCELERATED CALENDAR) |
| [L.B.], | : | |
| Defendant-Appellee, | : | |
| [A.B.], | : | |
| Third-Party Defendant/Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on September 13, 2016

**On brief**: *Cynthia M. Roy*, for appellant. **Argued:**
*Cynthia M. Roy*.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BROWN, J.

{¶ 1}  A.B., third-party defendant/appellant ("grandmother"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in which the court granted objections to a magistrate's decision filed by C.C., plaintiff-appellee ("father").

{¶ 2}  L.B., defendant-appellee, is the mother of X.B., born January 3, 2012, and Z.L., born March 28, 2014. C.C. is the biological father of the children. Grandmother is the children's maternal grandmother. On January 17, 2013, father filed a complaint to establish parentage, custody, visitation, and support with regard to X.B.  On August 14, 2014, father filed a complaint for allocation of parental rights/custody with regard to Z.L. in a separate case. In both cases, grandmother was granted emergency custody of the children, and mother and father were granted supervised visitation. In both cases, father and grandmother sought custody of both children.

{¶ 3}  A four-day trial was held before a magistrate commencing February 5, 2015. Father appeared at trial, represented by counsel; grandmother appeared, represented by counsel, and mother appeared sporadically, unrepresented.  Father and grandmother both presented witnesses and testified.  Mother did not present witnesses but did testify. A guardian ad litem ("GAL") testified at trial and submitted a report and recommendation at the end of trial.  At trial, much of the testimony centered on the accusation that father engaged in sexual activity with minors, including mother, in exchange for money and supplied minors with drugs and alcohol. It was undisputed that father, who was in his early 40s, began having sex with mother when she was 16 years old, although he claimed he believed she was at least 19 years old after she put an advertisement ("ad") on Craigslist for "Exotic Massages with Happy Endings." "Happy Endings" is a slang term for a sex act. On April 7, 2015, the magistrate issued a decision, in which she awarded grandmother

custody of both children, with father and mother receiving supervised parenting time. Father and grandmother filed objections to the magistrate's decision.

{¶ 4}  On March 15, 2016, the trial court issued a judgment, sustaining father's objections and granting custody to father, while finding grandmother's objections moot. The trial court found the testimony of grandmother's witnesses not credible, and there was insufficient evidence to find father to be an unsuitable parent. The trial court further reasoned that mother met father through a ad she voluntarily placed offering exotic massages, mother lied about her age in the ad, and father had no criminal record or arrests. Grandmother appeals the trial court's judgment, asserting the following assignments of error:

> [I.] The trial court erred and abused its discretion in awarding custody to appellee.
>
> [II.] The trial court's finding of suitability of appellee is against the manifest weight of evidence.
>
> [III.] The trial court's award of custody to appellee is contrary to law.

{¶ 5}  We address all of the assignments of error together, as they are interrelated. R.C. 2151.23(A)(2) "grants juvenile courts exclusive original jurisdiction 'to determine the custody of any child not a ward of another court of this state.' This includes 'custodial claims brought by the persons considered nonparents at law.' " *Rowell v. Smith*, 133 Ohio St.3d 288, 2012-Ohio-4313, ¶ 14, quoting *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, ¶ 42, 43. "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Hockstok v. Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Consequently, before awarding legal custody of a child to a non-parent, a court must determine that the parent is unsuitable. *Id.* at syllabus. This determination is "a necessary first step in child custody proceedings between a natural parent and nonparent." *Id.* at ¶ 18. A court may find that a parent is unsuitable if it finds, by a preponderance of the evidence, that the parent "abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or

that an award of custody to the parent would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89 (1977), syllabus. "Nonparents seeking custody have the burden of demonstrating a parent's unsuitability." *In re D.C.J.*, 8th Dist. No. 97681, 2012-Ohio-4154, ¶ 58.

{¶ 6}   Under *Perales*, a change of custody from a natural parent to another involves a two-step process. After determining the issue of unsuitability of the natural parent, the court must consider the best interests of the child.   R.C. 3109.04(F)(1) contains the following best-interest factors: (a) the parents' wishes; (b) the child's concerns and wishes; (c) the child's interaction with parents and others; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of involved individuals; (f) the parent more apt to honor and encourage companionship rights; (g) failure to make support payments; (h) whether either parent has committed a criminal offense or a neglect or abuse offense; (i) whether either parent has continuously and willfully denied court-ordered visitation; and (j) whether either parent has plans to reside outside the state.

{¶ 7}   A reviewing court may not reverse a juvenile court's custody determination absent an abuse of discretion. *In re Farrow*, 10th Dist. No. 01AP-837, 2002-Ohio-3237, ¶ 17; *In re Brown*, 142 Ohio App.3d 193, 198 (12th Dist.2001). In order to find an abuse of discretion, a reviewing court must conclude that the juvenile court's decision is unreasonable, arbitrary, or unconscionable. *Id.*  The discretion granted a juvenile court in custody matters should be afforded the utmost respect, given the nature of the proceedings and impact of the court's determination on the lives of the concerned parties, including, most importantly, the child at the center of the custody matter. *Id.*  In addition, credibility determinations and the weight to be afforded evidence are within the province of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus

{¶ 8}   Given these parameters, and on review of the records before us, we conclude the trial court abused its discretion when it rejected the magistrate's determination that father was unsuitable and that it was in the children's best interests that grandmother be granted custody. With regard to unsuitability, the magistrate found father was unsuitable because an award to father would be detrimental to the children.

The magistrate cited the undisputed facts that father had ongoing sexual relations with multiple females, including mother, prior to the birth of the children, and mother was a minor and father was in his 40s when the sexual relationship occurred. The magistrate acknowledged that much of the evidence surrounding the nature of these sexual relationships was in dispute, including whether father knew or should have known that some of the females were minors; whether father was involved in trafficking these females for sex; whether father introduced the females to drugs, cocaine, and alcohol; whether father engaged in only consensual sex after paying for massages; and whether father told mother that he wanted to involve his children in "The Game," or sex for profit, when they got older. The magistrate also acknowledged that father had not been arrested, charged, or convicted of any crimes resulting from his sexual encounters with mother and/or the other young females. However, although the magistrate found there were some discrepancies in the dates given by some witnesses, the magistrate concluded the testimony of grandmother's witnesses was compelling that some of the females were minors at the time father had sex with them. The magistrate found that the witnesses who engaged in sexual encounters with father did not appear to have any personal allegiance to mother or grandmother, had no motivation to lie, and gave testimony that was against their own interests. The magistrate concluded that the testimony of grandmother's witnesses, including mother, was credible. The magistrate also considered the GAL's report, which recommended grandmother be granted custody. Thus, the magistrate found that, based on the potential harmful effects on the children, and especially due to the young age of the children and their inability to self protect or report on any level, parental custody would be detrimental to the children.

{¶ 9}   On objections to the magistrate's decision, the trial court rejected the magistrate's recommendation and ordered father be granted custody.  The trial court found there was conflicting testimony as to whether father knew mother, and the girls she associated with, were minors. The court noted that father had never been arrested, charged, or convicted of any crimes resulting from his sexual encounters with mother and the other females. The trial court also pointed out that father disputed the testimony that he provided the young females drugs, cocaine, and alcohol. The court also cited favorably father's testimony that he met mother through her massage ad in which she indicated she

was over 18 years of age, and his testimony that the massages were paid for up front and the consensual sex occurred only afterward.   The court noted father's witnesses demonstrated his good character, that he was active in the community, he went to church, he owned his own landscaping business, he had stable housing, and he had the ability to provide for his children.

{¶ 10} The court concluded that mother was not credible and grandmother's witnesses were not credible, citing several inconsistencies in the dates regarding the encounters between father and mother and father and the other females. The court did not believe mother's claim that father recruited her and her associates into a prostitution ring when she admitted that she met father through her ad for "Exotic Massages with Happy Endings," it was her friend's idea to post the ad to make money, and she lied about her age in the ad. The court found that mother entered "The Game" voluntarily before meeting father.

{¶ 11} The court also found not credible mother's and her associates' testimonies that father paid them $300-$400 dollars several times a week for one year. The court reasoned that nothing from the evidence indicated father had the means to pay $60,000 in cash to mother and her associates, and no evidence indicated that mother was making $2,000 to $3,000 per month from father, particularly when it was reported that one child was bitten by mice in mother's infested apartment, and it was doubtful that mother would have lived in such a place if she was earning the money claimed.

{¶ 12} The court also found the testimony of father's sister, S.C., persuasive. The court noted S.C.'s testimony that father would routinely watch her children when she was at work, he would transport the children to and from school, and she had no reservations about leaving her children with him. The court also cited her testimony that father was very comfortable with X.B., and they had a good relationship. The court further relied upon the GAL's report, in which the GAL indicated that father had steady employment, owned his own business, and owned a home suitable for minor children. Thus, the court found there was "nothing" to indicate father would be unsuitable to parent the minor children.

{¶ 13} We find the trial court abused its discretion in concluding there was "nothing" to indicate father would be unsuitable to parent the children.  In fact, the record

contains an incredible amount of testimony that, if believed, would arise to the level of unsuitability to raise a child and militate against a finding that it would be in the best interest of the children for father to have custody. What the trial court actually found was that grandmother's witnesses were not credible and father and his witnesses were credible. However, the trial court did not view these witnesses in person, but only reviewed the transcript of the proceedings. The magistrate, as the true trier of fact, was in the better position to judge the credibility of the witnesses. The actual trier of fact present during the testimony is generally in the better position to judge the credibility of witnesses. *In re P.S.*, 10th Dist. No. 07AP-516, 2007-Ohio-6644, ¶ 25, citing *State v. Gibbs*, 134 Ohio App.3d 247, 256 (12th Dist.1999). Thus, we believe the magistrate's credibility determinations were more reliable and persuasive.

{¶ 14} Testimony regarding father's sexual encounters with minors and his knowledge of their age was the main focus of the trial court's and magistrate's decisions regarding unsuitability and the best interests of the children. On this issue, the parties presented several witnesses. D.P., who testified on behalf of father, said that she was mother's girlfriend when she met father in 2009. She said mother lied to both her and father that she was 18 years old, when she was actually 16. Mother presented to D.P. the idea of giving men massages and called it "The Game," and D.P. participated in it a few times. She said sometimes the massage would lead to consensual sex but not all the time, and she would not be paid extra for the sex. Father was one of D.P.'s regular customers for "The Game," and she would sometimes have sex with him. She said father would only pay for the massage and not the sex. Father, mother, and D.P. had two threesomes together, but father did not pay them for it. Mother's girlfriend after D.P., J.L., was also part of "The Game." D.P. said father helped her pay her bills, and she still cuts father's hair about once per month.

{¶ 15} J.J.P. testified he met father at church, and the two did outreach in the inner city together for many years. He said he and father do not see each other socially but only through church work. However, J.J.P. testified that he trusted father to transport his daughter to and from sporting activities at times, and he acted appropriately. He was unaware that father was having sex with underage girls during the time he knew him. He

believed the allegations against father were "ridiculous," but that was based on only discussions with father's counsel.

{¶ 16} Father testified that the first time he met mother was through a Craiglist ad in April or May 2009, and the ad indicated mother was 22 years old. He found out her actual age right before she turned 18. After answering mother's ad, he met mother, she gave him a massage, and they had sex. He then began meeting mother once per week. He denied that he went on Craigslist specifically to find someone advertising massages so he could have sex, and claimed he just happened to get sex the first time he got a massage. Father testified that he would sometimes get massages but would also go out socially with mother to the movies and to eat. He also received massages from D.P., C.H., and J.L., who were mother's friends or girlfriends. The massages from "a couple of them" led to sex. Father claimed he had more than 20 massages from mother, but only had sex with mother about half the time. Father said he also had sex with "Ashley" (L.D.W.), who was friends with mother and made sexual videos. He said he never paid L.D.W. for sex and denied that he supplied any of the females drugs or liquor. He said he also had sex with C.H., who was 17 at the time. Father calculated that, based on mother's testimony, he would have paid her about $76,000 for sex, plus payments to other females and costs of drugs and alcohol; yet, his total income for 2008 and 2009 was only $24,500. Father at first testified that he was spending about $1,000 per month on massages but only earned $13,700 in 2008, but when faced with those figures, he had no explanation for the discrepancy.

{¶ 17} L.D.W. testified she was friends with mother. When mother introduced her to father, L.D.W. was 15, and she told father her age. The next day, she had sex with father and continued to have sex with him for about two years. Father paid her for sex with either money, drugs or alcohol, including marijuana, ecstasy, cocaine, and liquor, and it was father who introduced her to drugs and cocaine for the first time. She called her sex with father "survival sex." She said father consumed all of the drugs and alcohol with them. She said father had sex with "Courtney" when she was 14, and she witnessed it. She claimed father paid Courtney for the sex and knew Courtney's age. She named several girls that father had sex with who were all under 18 years old, and she said father knew their ages. For all of these girls, father provided drugs, money, clothes, and shoes in

exchange for sex, and he never received massages from them. However, during her later testimony, it appeared that as of the date she said she met father she would have actually been 16, not 15.

{¶ 18} Mother testified that it was D.P.'s friend, Jane Doe, whose idea it was to place the ad for "Exotic Massages with Happy Endings." Father already had been a regular customer of Jane Doe's and answered mother's ad by calling her. The ad stated she was 19, but she was only 16 years old. Mother said that when she met father for the first time in a hotel room, father said he wanted a "Happy Ending" but no massage and paid her $200. About two days later, father called again, and they met at the hotel. He paid her $300-$400, and they had sex. Father never asked mother her age. A few weeks later, father started coming to her house about every day, and they would have sex, and father would pay her the same amount. Mother testified that her friend, C.H., became involved with father after father saw her one time on the street and asked mother to introduce them, and they subsequently had threesomes. C.H. was 15 years old. Mother said father paid her $300-$400 to get C.H. involved in "The Game," and he also paid C.H. for sex. Mother said father also paid for sex with J.L., who was 17 years old, and L.D.W., who was 15 years old. He paid mother $200 to get J.L. involved in "The Game," and also paid mother to recruit L.D.W. into "The Game," and they had a threesome. She claimed to have also recruited some other girls father saw on the street, who were also teenagers, to be involved in "The Game." One girl was Courtney, who was 13. Mother said father found out mother was only 16 years old but continued to have sex with her and pay her. She claimed to have told him the age of the other girls too, and he continued to have sex with them as well. Mother testified that father would supply the girls with marijuana, alcohol, and cocaine, and he used these substances with them. Mother said she only had sex with father when he would pay her. Mother further claimed that, after father raped her in November 2009, she did not see him again until September 2010, when they started having sex again. He also told her once when she was pregnant with X.B. that he could not wait until X.B. got older so he could put X.B. in "The Game." She said father paid her $300-$400 per sexual encounter, four to five times per week, and she never gave father a massage.

{¶ 19} Tabitha Woodruff, an anti-human trafficking coalition specialist with the Salvation Army, testified that mother is involved in counseling with its services. Christina Conrad, an anti-human trafficking clinical specialist with the Salvation Army, testified that she assessed that mother was a victim of human trafficking, and there was no motivation for mother to lie to her, as the Salvation Army plays only a therapeutic role. She provided therapy to mother for two years. She believed father was the sole trafficker of mother.

{¶ 20} Although a trial court must still independently assess the evidence and reach its own conclusions when reviewing a magistrate's recommendation, we believe the trial court's credibility assessment here was in error. The trial court did give its reasons for finding mother and grandmother's other witnesses not credible, but we believe these reasons are insufficient to reject their testimony. Initially, although we agree that father has never been charged or convicted of crimes resulting from his sexual encounters with any females who were allegedly minors, this fact holds little persuasiveness, given the amount of evidence presented by grandmother. Importantly, father indicated he found out that mother was under 18 before her 18th birthday, but he admitted that he continued having sex with her. His continuation of a sexual relationship with mother while she was a minor makes more convincing the testimony that he similarly disregarded that the other females with whom he admittedly had sex were underage. We also note the fact that father owned his own landscaping business and had stable housing, as cited by the trial court, does not in any way undermine the credibility of mother and her associates or make it less likely that he engaged in sex with underage females.

{¶ 21} Furthermore, the trial court believed the fact that father paid mother "up front" before massages and only engaged in sex after the massages without any further exchange of money was important support for the conclusion that the payments were only for the massages and not the subsequent sex. However, even if we were to believe that father was getting actual massages, which is highly questionable based on the testimony, the trial court's reasoning is dubious at best given that mother's ad specifically indicated that the massage included "Happy Endings," which, by definition, occur after the massage. Father's contention that he did not answer mother's ad to have sex was also completely unbelievable, given the "Happy Endings" reference. Father's repeated

contentions that he sought massages because his job in lawn care rendered his muscles sore was unbelievable, as none of the females who testified had experience in massage therapy or any licensing, and the references to "Exotic" and "Happy Endings" in the ad communicated quite clearly what services were being offered. It was also telling that father just "happened" to have sex with mother the very first time they met for a "massage."

{¶ 22} Furthermore, father's character witness, J.J.P., did not engender any further trust that father did not knowingly seek out and engage in sex with underage girls. J.J.P. testified he was unaware father had been engaging in sex with young women, he met father at church, he did community outreach with father, and father was a good person. That father might not have revealed to him that he engaged in sex with young girls and answered ads on Craigslist for "Happy Endings" is not surprising, given father's and J.J.P.'s relationship centered around church activities.

{¶ 23} The court also indicated that it did not find the testimony of mother or her associates credible regarding their claim that father recruited them into a prostitution ring. The court reasoned that it was mother who initially placed the ad for massages with "Happy Endings." However, these are not two mutually exclusive events. Although mother might have "entered 'The Game' voluntarily before meeting" father, as the trial court found, father could have still used mother to find other girls who would have sex with him for money, as mother testified. Therefore, we do not agree with the trial court's reasoning.

{¶ 24} The trial court found important that it did not believe mother's testimony that father paid her $300-$400 several times a week for well over one year. The court reasoned that this would translate to $60,000 t0 $70,000 per year, and nothing indicated that father could pay that amount or that mother made that amount. We do not disagree that these sums seem questionable for the reasons pointed out by the court but view them as more likely the result of poor estimation and youth rather than intentional inflation. Father did not deny that he engaged in sexual activities with mother and the other young females, and as questionable as mother's estimates were, father's estimate that he only received 20 massages over the course of several years and had sex only after 10 of the massages also fails to ring true.

{¶ 25} Therefore, based on the abundant evidence in the record showing that father sought sex from females whom he knew or should have known were under 18 years of age, and the very young age of his children, we agree with the magistrate that father was unsuitable to maintain custody of the children and the trial court abused its discretion in determining otherwise. The relevant issues turned on facts and allegations in dispute, and the magistrate was in the better position to make a credibility determination as to which witnesses were being truthful. Accordingly, we must reverse the trial court's determination as to unsuitability.

{¶ 26} With regard to whether it was in the best interests of the children to award custody to grandmother, both the magistrate and the trial court discussed each of the factors enumerated above from R.C. 3109.04(F)(1), and both came to essentially the same findings under each factor. The only significant departure from their respective findings was with regard to R.C. 3109.04(F)(1)(f), regarding who would be more apt to honor and encourage companionship rights. The trial court found father would be more likely to honor or facilitate parenting time, basing such on father's complaint that grandmother had failed to bring the children to several scheduled supervised visitations. The magistrate acknowledged that grandmother was questioned at trial as to her failure to bring the children to the supervised visits; however, the magistrate concluded that grandmother substantially complied with the orders. We agree with the magistrate that grandmother substantially complied with the orders. Grandmother testified that she had to cancel some visitations because she had a death in the family or one of the children was sick, but she always called ahead to cancel, all of which are reasonable explanations and actions. She said X.B. had missed six visits in the past year. Grandmother also testified that father had canceled a couple of visitations. Given this testimony, we fail to see how father would be more likely to honor visitation, and we find grandmother substantially complied with the visitation schedule.

{¶ 27} As for the other best-interest factors, it appears that both the trial court's and magistrate's findings would support it being in the best interest of the children to have custody granted to grandmother. We fail to see how the trial court concluded it was in the best interest of the children that father be granted custody of the children. Under factor R.C. 3109.04(F)(1)(c), the trial court admitted the children had lived with

grandmother for a substantial amount of time and had a good relationship with her, the children had little familiarity with father, and father had not had much contact with Z.L. since her birth. Under R.C. 3109.04(F)(1)(d), the trial court found the children were well adjusted in grandmother's home and had little to no time with their parents in their respective homes, although the court found father's home was suitable. Without consideration of the trial court's finding that father would be more likely to honor visitation, which we have found above was unsupported by the record, the trial court's findings are substantially the same as the magistrate's and weigh more in favor of grandmother's custody being in the best interest of the children. Therefore, we find the trial court erred in its best-interest determination.

{¶ 28} Given our above determinations that the trial court abused its discretion when it found father to be suitable for custody and when it found it was in the children's best interests for custody to be awarded to father, we must reverse the trial court's judgment that rejected the magistrate's decision and recommendation. Furthermore, in overruling the magistrate's decision and sustaining father's objection to the magistrate's decision, the trial court also found moot grandmother's objection to the magistrate's decision. In her objection, grandmother argued that the magistrate failed to address the issue of child support for her. As we have reversed the decision of the trial court, grandmother's objection is no longer moot and must be addressed by the trial court on remand. For all the foregoing reasons, grandmother's first, second, and third assignments of error are sustained.

{¶ 29} Accordingly, we sustain grandmother's three assignments of error, reverse the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, and remand these matters to that court for further proceedings in accordance with law, consistent with this decision.

*Judgments reversed and causes remanded.*

DORRIAN, P.J., and LUPER SCHUSTER, J., concur.

_____