[Cite as *In re H/B Children*, 2021-Ohio-1109.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: H/B CHILDREN.      :      APPEAL NO. C-200427
                                            TRIAL NO. F13-2259X

                                     :      *O P I N I O N.*

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 2, 2021

*Phyllis Schiff*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan E. Busam*, Assistant Public Defender, Guardian Ad Litem for the children.

**WINKLER, Judge.**

{¶1} Appellant mother appeals from a decision of the Hamilton County Juvenile Court granting custody of her three children to a family friend and denying her motion to remand custody of the children to her. We find no merit in her sole assignment of error, and we affirm the juvenile court's judgment.

{¶2} Mother has three children, N.H.1, born on December 24, 2006, N.H.2, born March 26, 2012, and N.B., born on December 20, 2017. Hamilton County Department of Job and Family Services ("HCJFS") originally became involved with the family in December 2013, when mother left her two oldest children home alone. As a result, mother was convicted of endangering children. The children were adjudicated neglected and dependent, and the juvenile court awarded temporary custody of them to HCJFS. Mother participated in services, and in February 2015, custody of N.H.1 and N.H.2 was remanded to mother, with protective supervision. The juvenile court terminated the order of protective supervision in July 2015.

{¶3} Mother subsequently gave birth to N.B. HCJFS sought emergency custody of all three children after N.B. suffered a fractured femur during a domestic dispute between his parents. As a result, mother was charged with and convicted of endangering children. The children were subsequently adjudicated dependent and placed in the temporary custody of HCJFS.

{¶4} The case plan for mother consisted of mental-health treatment and visitation. Mother submitted to a domestic-violence assessment, and no recommendations were made for further services. The only father involved was N.B.'s father. The case plan for him involved visitation, toxicology screens, and parenting enrichment. He also submitted to a diagnostic assessment and a

domestic-violence assessment, and there were no recommendations for further services.

{¶5} N.B.'s father made little progress in case-plan services. He frequently attended visitation during mother's visitation time. But he did not submit to toxicology screens, engage in a recommended fatherhood program, or receive any other services. He supported an award of custody to mother.

{¶6} Mother made some progress in case-plan services. She submitted to a diagnostic assessment and subsequent psychological evaluation. She was diagnosed with post traumatic stress disorder, depression, and a personality disorder. She engaged in counseling and received mental-health services from multiple providers. Generally, mother was consistent in her attendance, but there were periods where mother was not actively participating in therapy. Some of these gaps were due to mother's issues with therapists and some were because of personnel changes at the agencies providing her with services. Those gaps in attendance prevented her from making significant progress on her mental-health treatment.

{¶7} Mother visited with her children at the Family Nurturing Center ("FNC"). She was mostly consistent in attending visitation. She made progress in bonding with her children. She interacted well with them during visits and required minimal intervention. But mother's visitation remained facilitated, the most restrictive level, despite recommendations from FNC for less restrictive visitation. Though visits later occurred at mother's home, a facilitator was always present.

{¶8} Mother's visits were stopped by the FNC in November 2018 due to mother's inappropriate behavior, which included arguing and saying inappropriate things in front of the children. She refused to attend a meeting to discuss the issues,

so visitation stopped for approximately two and a half months. The visits resumed in February 2019.

{¶9} Mother was also required to maintain stable housing and income, which she accomplished all the while the case was pending. She participated in a supportive permanent housing program called Interfaith Hospitality Network. Mother has a four-bedroom house, which is clean and appropriate for the children.

{¶10} Despite mother's progress, her mental health remained an issue. She was uncooperative and combative with service professionals for herself and her children. One reason she had gaps in her mental-health treatment is that she switched therapists when she felt that they were not performing on her terms. She eventually started receiving treatment through IKRON, which she sought out herself. She chose the provider specifically to prevent HCJFS's involvement.

{¶11} The diagnostic assessment completed at IKRON was based entirely on mother's self-reporting and contained false information. As a result, the diagnoses might not have been accurate, and the treatment she was receiving may not have been sufficient. Consequently, HCJFS asked her to undergo another assessment with their provider to ensure that collateral information could be provided and that the diagnosis and treatment would be accurate. Mother refused to do so until October 2019. Even when she underwent the assessment, she was evasive and refused to answer some of the assessor's questions, stating that the answers were none of the assessor's business or irrelevant.

{¶12} The children went through several placements while in HCJFS's custody, some of which were detrimental to their well-being. The two oldest children have special needs. N.H.1 has been diagnosed with adjustment disorder. N.H.2 was diagnosed with ADHD, post traumatic stress disorder, and intermittent explosive

disorder. She had to be hospitalized, and was subsequently placed in St. Joseph Orphanage's Crisis Stabilization Unit ("CSU") due to her significant mental-health symptoms and behaviors.

{¶13} Professionals recommended that both N.H.1 and N.H.2 be placed on medication to allow them to focus and to stabilize their behavior. Mother was adamantly opposed to having them medicated. She believes that the children's behaviors are a choice that can be resolved by therapy, being with family, and participating in extracurricular activities. Mother was combative and argumentative toward treatment providers. Her behavior towards the staff at CSU caused it to cease direct communication with her. The issue of whether the children should be medicated eventually had to be litigated, and the court permitted the use of medication as requested by the children's treatment providers. Additionally, N.H.1 and N.H.2 both have individualized education plans ("IEPs") to address their academic deficits and behavioral issues. Mother was invited, but did not attend any school meetings for the children.

{¶14} HCJFS originally filed a motion to modify temporary custody and grant permanent custody to the agency. Subsequently, E.W., mother's friend and the children's godmother, filed a petition for custody of all three children. The children were subsequently placed with E.W., where they are doing well. They were integrated at their schools and engaged in extracurricular activities, including sports and Girl Scouts. Their behavior has improved.

{¶15} Mother's relationship with E.W. deteriorated after the children were placed with her, and it remains somewhat strained. E.W. was willing to allow visitation at her home, but mother chose not to engage in any visits outside of those involving FNC. Though the two older children are bonded with their mother and

have expressed a desire to live with her, they are bonded with E.W. and have stated that if they cannot live with their mother, they would like to live with E.W.

{¶16} Mother subsequently filed a motion asking the court to remand custody to her. HCJFS filed a motion to terminate temporary custody and award legal custody to E.W. After a number of hearings, the magistrate found that it was in the children's best interest to award legal custody to mother. Consequently, he granted her motion to remand and denied the motion to award custody to E.W.

{¶17} Both HCJFS and the children's guardian ad litem ("GAL") objected to the magistrate's decision. The juvenile court sustained the objections. It found that it was in the children's best interest to award legal custody to E.W. It "rejected and set aside" the magistrate's decision, granted the motion to award custody to E.W, and denied mother's motion to remand custody. This appeal followed.

{¶18} In her sole assignment of error, mother contends that the trial court erred in denying mother's motion for a remand of custody and in granting legal custody to E.W. She argues that the juvenile court's decision was against the manifest weight of the evidence. This assignment of error is not well taken.

{¶19} Under former R.C. 2151.353(A)(3), if the juvenile court finds a child to be abused, dependent or neglected, it may award legal custody to any person who has filed a petition for custody. *In re A.F.*, 1st Dist. Hamilton Nos. C-200230 and C-200231, 2020-Ohio-5069, ¶ 35; *In re M., R., & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 30. When determining legal custody, the court should base its determination on the best interest of the child. *In re T.K.M*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 28; *In re F.B.D.*, 1st Dist. Hamilton No. C-180356, 2019-Ohio-2562, ¶ 11.

{¶20} The statutory scheme sets forth no specific set of criteria when determining the best interest of the child in a legal-custody proceeding. But this court has held that the factors set forth in R.C. 2151.414(D) and 3109.04(F) are instructive. *In re T.K.M.* at ¶ 28; *In re F.B.D.* at ¶ 12. An appellate court must defer to the trial court's findings "regarding the weight to be given to any evidence because the trial court is in the best position to make that determination." *In re A.F.* at ¶ 36; *In re M., R., & H. Children* at ¶ 34.

{¶21} The juvenile court has discretion to determine what placement is in the child's best interest, and an appellate court will not reverse that decision absent an abuse of discretion. *In re T.K.M.* at ¶ 29; *In re M., R., & H. Children* at ¶ 30. An abuse of discretion exists when the court's decision is not supported by competent, credible evidence. *In re T.K.M.* at ¶ 29; *In re F.B.D.* at ¶ 11.

{¶22} The juvenile court considered the factors in R.C. 2151.414(D) and 3109.04(F). It acknowledged that the children were bonded with mother and wanted to live with her. The court also acknowledged that mother had been in therapy, but it was concerned with her ongoing mental-health issues.

{¶23} The magistrate attributed some of mother's behavior to mother having a strong personality and to her being justifiably frustrated with the reunification process. Nevertheless, competent, credible evidence showed that mother's issues went beyond frustration and were the result of mental illness. The trial court stated, "there have been significant gaps in therapy and breakdowns in communication between Mother and her therapists. Mother continues to display signs of uncontrolled anger in her communications with [HCJFS] workers, FNC workers and the Court, [and] she continues to display behavior that was construed by some

7

professionals as aggressive." The court was also deeply concerned that mother has twice been convicted of endangering children.

{¶24} The court also considered that the two oldest children had significant behavioral issues. It noted that the children "have thrived under the care of [E.W.]." It found that "Mother's unwillingness to work with and effectively communicate with professionals and service providers has been a barrier and is evidence of Mother's mental health issues that have not been resolved." Competent, credible evidence supported these findings.

{¶25} Mother relies heavily on the testimony of the facilitators from FNC who testified that visitation had gone well and that they believed she could have a less restrictive level of supervision. Some of their testimony was belied by the notes taken contemporaneously with the visitation. Evidence showed that an argument occurred between mother and N.B.'s father during one of the visits that went beyond a simple disagreement, which was concerning because the case began when N.B.'s leg was fractured during an argument between mother and N.B.'s father. Further, visitation was placed on hold due to mother's inappropriate behavior during a visit. It was not resumed for over two months because mother was resistant to scheduling a meeting to discuss the issues. Moreover, the FNC witnesses acknowledged that they don't see the "whole picture," and that HCJFS and the GAL were not in agreement with changing the level of visitation.

{¶26} Mother contends that the juvenile court ignored the magistrate's findings of fact. The record does not support that assertion. The court simply gave different weight to various witnesses' testimony and disagreed with the magistrate's best-interest findings. In ruling on objections to a magistrate's report, "[a] court may adopt or reject a magistrate's decision in whole or in part, with or without

8

modifications. A court may hear a previously-referred matter, take additional evidence, or return a matter to a magistrate." Juv.R. 40(D)(4)(b).

{¶27} A magistrate's duty is to "assist the courts of record." *Yantak v. Coach Builders, Ltd., Inc.*, 1st Dist. Hamilton No. C-060601, 2007-Ohio-5126, ¶ 10. A magistrate's oversight of issues is not a substitute for the trial court's judicial functions. *Id.* "It is the primary duty of the trial court, and not the magistrate, to act as a judicial officer." *Id.*

{¶28} While a trial court may defer to a magistrate's credibility determination, the trial court, not the magistrate, is the ultimate trier of fact. *In re A.S.*, 1st Dist. Hamilton No. C-180056, 2019-Ohio-2359, ¶ 20. "A magistrate is an arm of the court, not a separate judicial entity with independent judicial authority and duties." *Id.*, quoting *State ex rel. Dewine v. Ashworth*, 4th Dist. Lawrence No. 11CA16, 2012-Ohio-5632, ¶ 37. The trial court must make its own factual determination by undertaking an independent analysis of the issues. *In re A.S.* at ¶ 20.

{¶29} The juvenile court was required to conduct an independent review of the magistrate's decision. The court, after reviewing the transcript of the proceeding before the magistrate, was free to disagree with the magistrate's conclusions and to enter an order it found to be in the children's best interest. *See In re J.G.S.*, 1st Dist. Hamilton No. C-180611, 2019-Ohio-802, ¶ 36; *In re Ross*, 154 Ohio App.3d 1, 2003-Ohio-4419, 796 N.E.2d 6, ¶ 8 (1st Dist.).

{¶30} The juvenile court ultimately concluded that mother "has been unable to demonstrate that she can provide a safe and stable environment for the children" and that it was in the children's best interest to grant legal custody to E.W. "[A] legally secure placement 'is more than a house with four walls. Rather, it generally

9

encompasses a stable environment where a child will live safely with one or more dependable adults who will provide for the child's needs.' " *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 42, quoting *Matter of K.W.*, 2018-Ohio-1933, 111 N.E.3d 368, ¶ 87 (4th Dist.).

{**¶31**} Further, an award of legal custody does not divest the parents of their residual parental rights and responsibilities. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 21; *In re T.K.M.*, 1st Dist. Hamilton No. C-190200, 2019-Ohio-5076, at ¶ 23. Mother will still be able to visit and have a relationship with her children.

{**¶32**} Competent, credible evidence supported the juvenile court's decision to award custody to E.W. Consequently, we cannot not reverse that decision as being an abuse of discretion. *See In re T.K.M.* at ¶ 32; *In re M., R., & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, at ¶ 30. We overrule mother's sole assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**MYERS, P.J.**, concurs.
**BERGERON, J.**, concurs in judgment only.

**BERGERON, J.**, concurring in judgment only.

{**¶33**} In light of the applicable deferential standard of review—and after combing through the record below—I agree with my colleagues that competent and credible evidence supported the juvenile court's grant of legal custody to K.W. But I write separately to express my frustration with the juvenile court's cavalier attitude toward the magistrate's credibility determinations, and to highlight the problems that this approach creates for meaningful appellate review.

{¶34} One of the overarching concerns in this case was Mother's mental health. In accordance with her case plan, Mother underwent multiple diagnostic assessments and began attending therapy through the Central Clinic, eventually opting to transfer to another provider less closely-connected to HCJFS. After two years of counseling and consistent visitation, Mother insisted that she was a changed parent, ready to welcome her children back into her home. A facilitator with the Family Nurturing Center marveled at the transformation: she had "never seen a parent work so hard," and had "absolutely no concerns about [Mother's] parenting. None."

{¶35} Of course, HCJFS and the guardian ad litem disputed Mother's narrative of growth and redemption. On appeal, both parties characterize Mother as "uncooperative" and "combative," fault her for switching therapists, and maintain that she failed to make significant progress in her mental health treatment. They present some serious questions as to Mother's success in remedying the factors that led (for the second time now) to her children's removal from the home.

{¶36} In this matter, the magistrate ruled in Mother's favor, largely hinging his determination on his evaluation of Mother's credibility. But the juvenile court, reviewing the same record and without entertaining any new evidence, reversed course. As I compare the magistrate's decision with the juvenile court's order, I see precious few differences between the two. Both fact-finders determined that Mother made progress in her treatment and substantially complied with her case plan. Both noted Mother's past conviction for child endangerment and the seriousness of the incident that led to removal here. But the magistrate, who observed Mother's demeanor while testifying, became convinced that her participation in services resulted in meaningful progress:

In the past mother has made some serious mistakes. Mother has worked hard to overcome those misdeeds. Mother has engaged in rehabilitative services. Mother has been separated from her children for a substantial period. Mother has been patient. Mother has become acutely aware of how important it is for her to address her mental health, and exercise good judgment, especially concerning her children.

{¶37} The magistrate frankly acknowledged that some professionals in this case believed Mother's behavior conveyed "hostility and aggression." However, he also found that Mother had "legitimate reasons to be frustrated" with the reunification process, including the bureaucratic gauntlet created by HCJFS, poor communication by HCJFS, and very real concerns that the children were being neglected in a previous, poor foster placement.

{¶38} The juvenile court's order echoes—nearly verbatim—most of the magistrate's findings of fact. As a result, we know we aren't dealing with a magistrate going rogue, or one who completely botched the appraisal of the evidence. Nevertheless, the juvenile court did not share the magistrate's faith in Mother's evolution as a parent. It focused instead on "gaps" and "breakdowns" in Mother's therapy, "inappropriate behavior" in 2018 visitations, and Mother's purported "unwillingness" to work with professionals and service providers. It concluded that Mother was unable to provide a safe and stable environment for the children, rejected the decision of the magistrate, and awarded legal custody to K.W.

{¶39} As explained by my colleagues above, the record can be read to support the juvenile court's conclusion on the best interest determination. But what the juvenile court's order doesn't explain—leaving us wholly in the dark—is how and why

12

it came to disagree with the magistrate. In a case hinging almost entirely on witness credibility (do we believe Mother's proclamation of reform, or do we not?), this failure to elucidate looms large.

**{¶40}** Juv.R. 40(D), like Civ.R. 53(D), requires the trial court to "undertake an independent review as to the objected matters." *See In re E.R.M.*, 1st Dist. Hamilton No. C-190391, 2020-Ohio-2806, ¶ 19 ("Juv.R. 40 and Civ.R. 53 are analogous."). Independently reviewing the record, however, is not the same as jettisoning the credibility determinations of the actual trier of fact: the magistrate. Time and again, we have emphasized that "the magistrate, as the trier of fact, 'is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented.' " *In re S.D.*, 1st Dist. Hamilton Nos. C-200045 and C-200084, 2020-Ohio-3379, ¶ 18, quoting *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16. *See In re X.B.*, 10th Dist. Franklin Nos. 16AP–243 and 16AP–277, 2016-Ohio-5805, ¶ 13 ("The magistrate, as the true trier of fact, was in the better position to judge the credibility of the witnesses"). A juvenile court's decision to overrule the magistrate's credibility determinations—especially without entertaining new evidence—is nearly always a cause of "concern" to this court. *See id.* This is not to say that the juvenile court should blindly adopt the magistrate's conclusions—far from it. Juv.R. 40(D) requires independent review, and our case law mandates a self-supporting analysis. *See In re A.T.*, 1st Dist. Hamilton Nos. C-160597, C-160598 and C-160599, 2017-Ohio-5821, ¶ 10 (rejecting a trial court's judgment entry which simply "approved and adopted" the magistrate's decisions). But where the juvenile court chooses to disregard the magistrate's credibility determinations, it has a simple job: tell us why. When it does not, the lack of explanation risks undermining the entire decision.

13

**{¶41}** By way of example, one contradiction between the magistrate's and the juvenile court's orders in this case is particularly troubling. In one of its few clear departures from the magistrate's order, the juvenile court found that Mother "continues to display signs of uncontrolled anger in her communications with * * * the Court * * *." It cited no specific testimony or exhibits to support this assertion. Yet the magistrate, who actually observed Mother's "communications with" the court, explicitly found that "Mother was respectful to the court." Without some explanation, these statements are hopelessly irreconcilable. The unexplained contradiction undermines my confidence—and surely Mother's too—in the reliability of the balance of the juvenile court's factual findings.

**{¶42}** I concur with my colleagues in upholding the trial court's decision because, after reviewing the exhibits and testimony of record, I can infer how the "independent review" mandated by Juv.R. 40(D) might have caused the trial court to depart from the magistrate's conclusions. But this retrospective knitting-together of isolated threads of the record is exactly the problem that I want to emphasize. In the utter "absence of any analysis of how the magistrate went astray," we are left to comb the record for pieces of testimony and evidence weighing against the magistrate's decision, and speculate on the trial court's reasoning from what we find. *See In re E.R.M.* at ¶ 15. This is not the proper role of an appellate court. *See id.* at ¶ 22 ("While our standard of review is abuse of discretion, we must see evidence of how that discretion was exercised in order to conduct meaningful appellate review."; *In re T.M.*, 1st Dist. Hamilton No. C-200009 and C-200012, 2020-Ohio-6950, ¶ 19 (noting that the juvenile court's "rudimentary analysis, requiring this court to scour the record to understand [its] reasons," frustrated appellate review). The potential for the record to mislead—especially on issues of witness credibility—is why appellate

14

courts defer to the finder of fact in the first place. This deference is difficult to justify when the juvenile court not only disregards the findings of the "true trier of fact," but fails to offer any justification for doing so. *See In re X.B.* at ¶ 13.

**{¶43}** Beyond my own complaints of impediments to appellate review and deference to the finder of fact lies a deeper problem: Mother deserves an explanation. She deserves to know why, after reviewing the exact same record as the magistrate but without observing her testimony in-person, the juvenile court rejected the magistrate's credibility determinations. I regret that we cannot offer her that, and therefore respectfully concur in judgment only.

Please note:

The court has recorded its own entry this date.