[Cite as *In re S.D.*, 2020-Ohio-3379.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: S.D., R.D., J.D., and M.D.  :  APPEAL NO. C-200045
                                        C-200084
                                   TRIAL NO.  F16-2016X

                                   :

                                        *O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  June 18, 2020

*Jon R. Sinclair,* for Appellant Mother,

*Anzelmo Law* and *James A. Anzelmo,* for Appellant Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patrick Stapp*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Allison McWhorter,* Assistant Public Defender, Guardian ad Litem for Appellee minor children.

CROUSE, Judge.

{¶1}   In this parental-termination case, the juvenile court overruled the magistrate's decision and granted permanent custody of the minor children to the Hamilton County Department of Job and Family Services ("HCJFS").  The parents have appealed.  Mother argues in one assignment of error that the juvenile court erred in granting HCJFS's motion for permanent custody.  Father argues in one assignment of error that HCJFS failed to establish, by clear-and-convincing evidence, that it should be granted permanent custody of the children.

{¶2}   We consider mother's and father's assignments of error together.  Both assignments of error are sustained.  The judgment of the juvenile court is reversed, and the cause is remanded with instructions to the juvenile court to issue a judgment entry adopting the magistrate's decision awarding legal custody of the children to the parents with protective supervision of M.D. by HCJFS.

### *Factual Background*

{¶3}   On September 13, 2016, nine-year-old S.D. and two-year-old R.D. were found home alone without adult supervision.  A school official had gone to the house because S.D. had missed ten days of school so far that school year.  When the parents had not returned by 4 p.m. that day, the official called police.  It was later discovered that at the time S.D. was experiencing seizures on a weekly basis.  HCJFS was granted interim custody of S.D. and R.D. on September 14, 2016.  On November 16, 2016, the magistrate adjudicated S.D. to be abused, neglected, and dependent, and R.D. to be neglected and dependent.

2

{¶4} The parents were ordered by the magistrate to comply with the following dispositional orders: (1) provide access to HCJFS and the guardian ad litem ("GAL") and sign release-of-information forms; (2) complete mental-health and chemical-dependency assessments and follow all recommendations; (3) complete random toxicology screens; (4) obtain and maintain income and stable housing; (5) complete parenting classes; (6) establish father's paternity; and (7) complete AMEND assessment/domestic-violence-awareness classes and follow the recommendations.

{¶5} While the case involving S.D. and R.D. was pending, mother gave birth to the two youngest children, J.D. (January 11, 2017) and M.D. (November 28, 2017). Both children were placed in the interim custody of HCJFS—J.D. on January 23, 2017, and M.D. on December 1, 2017.

{¶6} On June 14, 2018, HCJFS filed a motion for permanent custody, which was denied by the magistrate on April 12, 2019. The magistrate ordered that the children be returned to the custody of their parents, with protective supervision by HCJFS of M.D. As part of the order for protective supervision, the magistrate ordered that the parents provide access to HCJFS and the GAL, complete home-based therapeutic services, complete random toxicology screens, and maintain stable income and housing.

{¶7} HCJFS and the GAL filed objections and motions to present newly discovered evidence. The juvenile court held a brief hearing on August 22, 2019, but decided to consider the parties' arguments via written submissions instead of conducting an objection hearing. The court granted the motions to present newly discovered evidence in part, and accepted evidence that mother had been charged

with theft on May 23, 2019. The court sustained the objections, set aside the magistrate's decision, and granted permanent custody to HCJFS on January 28, 2020.

{¶8} The four minor children in this case all have the same mother. Father is the confirmed father of the three youngest children, and the alleged father of S.D. Mother, father, and S.D. are from Guatemala, but came to the United States approximately four years prior to the permanent-custody trial. Father speaks some English, but the parents primarily speak Spanish and Mam. Interpreters were provided to facilitate communication between HCJFS and the parents and during all court proceedings, visitations, home visits, and services.

{¶9} There have been three HCJFS caseworkers over the course of the case. Jennifer Adams was the caseworker from October 2016 to November 2017. Samantha Benny was the caseworker from January 2018 to June 2018. Caitlin Francesconi was the caseworker at the time of trial after taking over in July 2018. Julie Pederson is the GAL for all four children.

{¶10} Over four days of trial, the caseworkers and GAL testified generally that throughout the case the parents failed to communicate consistently with HCJFS and did not seem to understand why the children were removed from the home, what was going on with their case, or what HCJFS's concerns were for the children.

### *The Permanent-Custody Determination*

{¶11} Parents' interest in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *In re D.A.,* 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 8, quoting *Troxel v. Granville* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49

4

(2000). "Permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." *In re D.A.* at ¶ 10. The termination of parental rights should be an alternative of "last resort," and is only justified when it is necessary for the "welfare" of the child. *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979).

{¶12} "Reviewing a juvenile court's grant of permanent custody requires that we independently find that clear and convincing evidence supports the decision." *In re L.M.B. & M.A.B.,* 1st Dist. Hamilton Nos. C -200033 and C-200044, 2020-Ohio-2925, ¶ 8. Clear-and-convincing evidence produces "in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In reviewing a challenge to the sufficiency of the evidence, we must examine the record and determine whether the evidence on each element satisfies the clear-and-convincing standard. *In re L.M.B. & M.A.B.* at ¶ 8. For manifest-weight challenges, we must "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the [juvenile] court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re A.B.,* 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16.

{¶13} When children have been previously adjudicated abused, neglected, or dependent and temporary custody has been granted to HCJFS pursuant to R.C. 2151.353(A)(2), HCJFS may then move for permanent custody of the children pursuant to R.C. 2151.413(A) and 2151.414. The court will grant permanent custody

to HCJFS if a two-prong test is satisfied. The court must find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) permanent custody is in the best interest of the children under R.C. 2151.414(D)(1)(a)-(e). *See* R.C. 2151.414(B)(1).

### *The First Prong—R.C. 2151.414(B)*

{¶14} The first prong can be satisfied by any one of five conditions, including if the court finds that the children cannot be placed with either of the children's parents within a reasonable time or should not be placed with the children's parents, or if the children have been in the custody of a children's services agency for at least 12 months of a consecutive 22-month period prior to the filing of the motion for permanent custody ("12-in-22" provision). R.C. 2151.414(B)(2) and 2151.414(B)(1)(d).

{¶15} The starting point for the 12-in-22 clock is either the date the child was adjudicated dependent or 60 days after the removal of the child from the home, whichever is earlier. R.C. 2151.414(B)(1)(e). The end-point for the 12-in-22 clock is the date the agency filed the motion for permanent custody. *In re C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26.

{¶16} S.D. and R.D. are considered to have been in the temporary custody of HCJFS since November 13, 2016, 60 days after they were removed from the home. J.D. is considered to have been in the temporary custody of HCJFS since March 22, 2017. M.D. is considered to have been in the temporary custody of HCJFS since January 30, 2018. Therefore, M.D. was only in the custody of HCJFS for approximately four months when it filed its motion for permanent custody on June 14, 2018. The 12-in-22 condition is satisfied as to S.D., R.D., and J.D., but not M.D.

6

{¶17} The juvenile court also found that all of the children could not be placed with either of the parents within a reasonable time or should not be placed with the parents. *See* R.C. 2151.414(B)(1)(a). When determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent, the court shall consider all relevant evidence. R.C. 2151.414(E). If the court determines, by clear-and-convincing evidence that one or more of the factors in R.C. 2151.414(E)(1)-(15) exist as to each of the child's parents, the court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *Id.*

{¶18} Before we begin our analysis, we note our concern that the juvenile court overruled several of the magistrate's factual findings that were based on witness credibility determinations—without hearing any additional evidence. Where a party files objections to a magistrate's decision, the juvenile court is authorized to conduct a de novo review of a magistrate's legal and factual findings. Juv.R. 40(D)(4)(d). But, where the magistrate makes a factual finding based upon the credibility of the witnesses, the juvenile court must be mindful when conducting a de novo review of such a factual finding without entertaining new evidence that the magistrate, as the trier of fact, "is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson,* 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16; *see In re X.B.,* 10th Dist. Franklin Nos. 16AP–243 and 16AP–277, 2016-Ohio-5805, ¶ 13 ("the magistrate, as the true trier of fact, was in the better position to judge the credibility of the witnesses"). The juvenile court judge did not have the advantage of being present in the courtroom as the witnesses testified and observing the witnesses' demeanor.

7

{¶19} The juvenile court found that the conditions in R.C. 2151.414(E)(1), (2), (3), (4), (8), (14), and (15) were satisfied, and held that the children could not be returned to the parents within a reasonable time.

{¶20} R.C. 2151.414(E)(1) requires the court to consider whether:

the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶21} The children were removed from the home due to concerns over domestic violence, supervision and parenting, and medical and education neglect. The magistrate found that the parents had completed all case-plan services and that the children could be placed with the parents within a reasonable time. The juvenile court acknowledged that the parents had complied with the case plan, but held that they had "failed to demonstrate behavior change sufficient to remedy the issues" that caused the children to be removed from the home. It cited concerns about domestic violence, the parents' inability to supervise all four children for extended periods of time, lack of interaction between the parents and S.D. during visitations, and mother's mental health.

{¶22} The allegations of domestic violence originated in the case plan filed by HCJFS on November 2, 2016. In the case plan, HCJFS caseworker Jennifer Adams

noted, "There is no SACWIS [Statewide Automated Child Welfare Information System] or Clerk of Court's [sic] history that would indicate that [father] has ever abused any children before." But, Adams wrote that S.D. told her that she had seen father punch mother in the chest and hit mother on the side of the head. S.D. also said that father would hit her with a phone charger if she did not complete her chores quickly enough. Adams also noted that "there are marks that have been seen on R.D.'s legs that the agency and the check clinic may believe to have been caused by [R.D.] being hit by a switch or tied up."

{¶23} On November 16, 2016, the magistrate adjudicated S.D. to be abused based upon the "clear and convincing evidence presented and the stipulations entered." In the adjudication of J.D. on April 19, 2017, the parties stipulated to the complaint for interim custody as written. The complaint stated that S.D. and R.D. were removed from the home and adjudicated dependent due to concerns of S.D. being left home alone with R.D., medical neglect of S.D., and domestic violence by father in the presence of the children. In the adjudication of M.D. on March 1, 2018, the magistrate found by clear-and-convincing evidence that S.D. and R.D. were adjudicated abused, neglected, and/or dependent due to educational neglect, medical neglect, and domestic violence in the presence of the children.[1]

{¶24} In its decision denying the motion for permanent custody, the magistrate found that HCJFS had failed to prove that the parents had ever engaged in altercations or that domestic violence was an ongoing concern in the case. The juvenile court acknowledged that there was little evidence in the record of domestic violence. However, it set aside the magistrate's finding and found that not only had

---

[1] It is important to note that R.D. was never adjudicated abused.

domestic violence been established, but that the parents had failed to demonstrate behavioral change regarding domestic violence.

{¶25} Throughout the case, the parents have steadfastly denied that any domestic violence occurred. Nevertheless, they completed domestic-violence-prevention services as required by the case plan. It took three referrals because father was disenrolled twice due to nonattendance, but he completed the Transform program, which consisted of 28 classes designed to prevent domestic violence. Mother also completed domestic-violence-prevention services, in the form of the Women Helping Women classes.

{¶26} The HCJFS caseworkers and the GAL all testified that parents either could not articulate what they learned from domestic-violence-prevention services, or gave contradictory answers. Pederson testified that mother appeared visibly intimated by father. She testified that when asked questions, mother looked fearful, looked towards father for direction, and would not answer until father nodded or answered for her. Pederson testified that when she spoke with mother alone, she answered quickly and without hesitation. However, Pederson admitted that she never asked mother about domestic violence outside the presence of father. It is also important to remember that mother speaks no English, while father speaks some English. Therefore, even if they were communicating through an interpreter, it is understandable that mother might look to father before answering questions posed by the GAL or caseworkers.

{¶27} Although father initially testified that he had no idea why he was required to take domestic-violence classes, and that he only learned about five percent from the classes, he later testified that the classes were "good," and that he

learned to listen to people and to control his anger and emotions. He testified that he learned that if he became angry to take a ten minute break and go outside and let things "air out." Also, when father completed the Transform program, he received a completion summary that detailed his participation in the program. According to the completion summary, father performed "fair" to "good" in all areas of the course, his efforts were "adequate," and he "seem[ed] to be at low risk level to re-offend." Mother testified that she learned that if she gets into a fight with father she can go outside or into another room. During the pendency of the case there were no allegations or physical signs of domestic violence.

{¶28} Considering the parents' compliance with their case plan, their testimony at trial that they had learned from services, the fact that there were no allegations or signs of domestic abuse during the pendency of the case, and the meager evidence from which the concerns of domestic violence arose in the first place, the juvenile court's finding regarding domestic violence was not supported by clear-and-convincing evidence.

{¶29} Second, we address the issue of the parents' ability to supervise the children. The magistrate found that the parents can provide proper supervision. She cited to the parents' completion of all case-plan services and the notes from the parents' Family Nurturing Center ("FNC") visitations, which contradicted the testimony of the GAL and HCJFS caseworkers that the parents' parenting and supervision skills at visitations had not substantially improved. She also noted that during the pendency of the case there were no reports of the parents having problems supervising the children.

{¶30} The juvenile court disagreed and held that the parents had not substantially improved their ability to supervise the children. It relied on the testimony of the caseworkers and Pederson, all of whom observed only a few visitations each, and only stayed for a portion of the visitations they did observe.

{¶31} As part of the magistrate's dispositional orders, the parents were required to complete parenting classes. Father completed all of the parenting classes. Mother missed one class, but the caseworkers agreed that she demonstrated an eagerness to improve her parenting throughout the case.

{¶32} The parents were also ordered to attend visitations with the children at FNC. During each visitation, an FNC facilitator filled out a "Visitation Observation and Planning Form" that included notes taken by the facilitator during the visit. Visitation forms from July 2018 to November 2018 were admitted as exhibits at trial. Also admitted was an FNC quarterly report covering the period of July 2018 to September 2018.

{¶33} The quarterly report summarized the parents' goals for visitations and indicated whether the parents were progressing on those goals. Overall, the parents were showing sufficient to very good progress on the majority of their goals. The quarterly report also summarized significant progress or concerns from the reporting period. It indicated that the parents achieved two of their goals during the reporting period—to speak to each child for five minutes and to teach the children something new during each visit. The report also listed two concerns—the parents consistently arriving late for visits and their inconsistency in providing redirections to the children.

{¶34} Caseworker Samantha Benny testified that the visitations stayed at the strictest level of facilitation throughout the case, and there was never a recommendation to decrease the level of facilitation. At trial, mother denied ever leaving S.D. home alone to watch R.D., despite clear evidence to the contrary, and both parents gave inconsistent testimony as to why the children were removed from the home initially and whether they understood HCJFS's concerns. However, Adams testified that mother understood that leaving S.D. home alone was a mistake. Father also testified that leaving S.D. home alone was a mistake.

{¶35} In her answers on the FAIR assessment, mother explained that her decision to leave S.D. home alone to care for R.D. was based upon cultural norms in Guatemala. She told the assessor that growing up in Guatemala she helped care for her younger siblings, including duties usually reserved for adults in the United States. She expressed frustration that some things that are acceptable in Guatemala are not acceptable in the United States.

{¶36} Moreover, the parents completed the parenting classes, were clearly making progress on their parenting goals, and testified that they would not leave S.D. home alone in the future to care for a younger sibling. The juvenile court's finding regarding the parents' ability to supervise and parent the children was not supported by clear-and-convincing evidence.

{¶37} Third, we address the issue of the lack of interaction between the parents and S.D. during visitations. The juvenile court found that parents had failed to substantially remedy the concerns of neglect because they failed to adequately interact with S.D. during visitations. As an initial matter, we note that the juvenile court's finding that the parents failed to interact with S.D. during visitations is belied

by the FNC visitation notes and the FNC quarterly report. Nevertheless, we need not consider whether the court's finding is supported by clear-and-convincing evidence because a lack of interaction between parents and a child during visitations does not fall within the definition of neglect provided by R.C. 2151.03(A).

{¶38} As relevant, R.C. 2151.03(A) defines a neglected child as any child who "lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian," or whose "parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being."

{¶39} R.C. 2151.011(B)(1) defines "adequate parental care" as the "provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs." *In re T.B.,* 12th Dist. Fayette No. CA2014–09–019, 2015-Ohio-2580, ¶ 14. A lack of interaction during visitations does not fall within those definitions.

{¶40} Lastly, the juvenile court cited to mother's failure to change her behavior regarding her mental health. However, the children were not removed from the home because of concerns regarding mother's mental health. Therefore, her mental health should not be considered under R.C. 2151.414(E)(1), and is instead properly considered under (E)(2).

{¶41} In summary, a lack of interaction between the parents and S.D. during visitations, even if true, does not fall within the statutory definition of neglect. HCJFS failed to present clear-and-convincing evidence that the parents "failed

continuously and repeatedly to substantially remedy the conditions" that caused the children to be removed from the home. *See* R.C. 2151.414(E)(1). The juvenile court erred in finding the R.C. 2151.414(E)(1) condition satisfied.

{¶42} Under R.C. 2151.414(E)(2), the court considers whether a parent suffers from chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency that is so severe that the parent will be unable to provide an adequate permanent home for the child at the present time or within one year.

{¶43} The juvenile court found the condition in R.C. 2151.414(E)(2) satisfied because of mother's mental-health concerns and a possible intellectual disability. The court noted that mother only has a third grade education, and that her inconsistent statements and confusion around the expectations of parental care *could* be a result of low cognitive functioning. However, to the extent the court found that mother has an intellectual disability, there was not clear-and-convincing evidence presented to support such a finding. Testimony that mother was sometimes confused and made inconsistent statements falls far short of clear-and-convincing evidence that she has an intellectual disability. Mother's confusion and inconsistent statements may just as easily be attributed to a lack of understanding of United States cultural norms compared to Guatemala, the language barrier, or fear of government officials.

{¶44} Mother attempted suicide in February 2017, shortly after J.D. was removed from her care. Afterwards, she completed three sessions of individual therapy and was discharged. The caseworkers and Pederson testified that mother could not articulate to them what she had learned from counseling, and only told

15

them that she no longer needed to go. Adams testified that mother told her that she attempted suicide because she was really sad about the children being removed, but that she would not attempt suicide again.

{¶45} Mother testified that during therapy she addressed her attempt to commit suicide, and that she and her counselor talked about her mental well-being. She testified that she felt depressed at the time of her attempt, but no longer felt depressed after therapy. Mother admitted into evidence a letter from her therapist that stated that she had completed all scheduled appointments, and that she was "working hard to make positive changes in her life, and did not report any symptoms or behaviors that would indicate ongoing depression." The only evidence presented by HCJFS to the contrary was from Pederson, who testified that even after therapy, mother still "looks sad."

{¶46} Mother's mental health was undoubtedly a serious concern at one point in the case. Nevertheless, mother and her counselor both indicated that mother's mental health was no longer a serious concern, and HCJFS presented no evidence that since her suicide attempt, mother's mental illness has prevented her from functioning in everyday life, affected her interactions with the children, or has been an ongoing issue throughout the case. Therefore, the juvenile court's finding that mother's mental illness was so severe as to prevent her from providing an adequate permanent home was not supported by clear-and-convincing evidence.

{¶47} Under R.C. 2151.414(E)(3), the juvenile court considered whether either parent had committed any abuse against a child, or caused or allowed a child to suffer neglect as defined in R.C. 2151.03, between the date that the original

complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody.

{¶48} R.C. 2151.414(E)(3) explicitly confines our analysis to the time period between the filing of the original complaint on September 13, 2016, and June 14, 2018, the date the motion for permanent custody was filed. There was no evidence of abuse presented after the original complaint alleging abuse and neglect of S.D. and R.D. was filed. The juvenile court found the condition in R.C. 21515.414(E)(3) satisfied because of the parents' neglect of S.D. during visitations. As discussed above, a lack of interaction with S.D. during visitations does not fall within the definition of neglect as defined in R.C. 2151.03(A) and is contradicted by the FNC records. Therefore, the juvenile court's finding regarding R.C. 2151.414(E)(3) was not supported by clear-and-convincing evidence.

{¶49} Under R.C. 2151.414(E)(4), the juvenile court considered whether the parents "demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with the child[ren] *when able to do so*, or by other actions showing an unwillingness to provide an adequate permanent home for the child[ren]." (Emphasis added.)

{¶50} The magistrate found that, although the parents had missed visitations, they had never been discharged from visiting, and that missing visitations for excusable reasons, such as work or transportation issues, did not justify terminating their parental rights. The juvenile court overruled the magistrate and found that the condition in R.C. 2151.414(E)(4) was satisfied due to the parents' inconsistency in attending visitations.

17

{¶51} The parents had visitations with the children twice a week, with each visitation lasting two hours. The parents' inconsistency in attending visitations was a concern since the early days of the case, especially regarding father. Adams testified that when she was supervising visitations in the earliest days of the case, father attended about 75 percent of the visitations, and if he did not attend he would call ahead of time. She also testified that mother was more consistent than father in attending visitations.

{¶52} However, during the five months leading up to trial, July 1, 2018, to November 3, 2018, mother missed six and father missed 13 out of a total of 30 scheduled visitations (after subtracting visits canceled by FNC or the foster parents). Additionally, the parents were over 15 minutes late for at least eight of the visitations they attended during that time period. Due to frequent missed visitations, the parents were required to call FNC the day before a visitation and confirm they would be there; otherwise the visitation would be canceled.

{¶53} The recurring excuses given by the parents were car trouble and work conflicts. Caseworker Caitlin Francesconi testified that she attempted to provide the parents with bus passes, and asked father for a work schedule so she could adjust visitations accordingly, but the parents declined the bus tokens and father never provided a work schedule. Francesconi testified that father's work schedule is sporadic; his employer calls him in the morning if they need him that day, and he only ends up working two to three days a week. Also, as the trial progressed, the parents continued to miss visitations. Pederson testified that the parents missed two visitations in December 2018, right in the middle of trial. Francesconi testified that in January 2019, the parents had one of their weekly visitations canceled due to three

consecutive no-shows. However, mother testified that she missed one of those visitations because she was recovering from surgery, and the other two because of car trouble.

**{¶54}** On November 30, 2018, father testified that he had missed two visitations over the last two months, but admitted that it could have been more. According to the FNC visitation notes, he had actually missed five during that time period. He testified that at the time of trial he was only working one to three days per week. He admitted that HCJFS asked for verification of his employment, but he never provided it because his job would not give him any documents to verify his employment.

**{¶55}** There is no set number of parental visits that proves that a parent is committed to their child. *In re Willis*, 3d Dist. Allen No. 1–02–17, 2002-Ohio-4942, ¶ 31. Rather, the "focus [must be] on the particular facts of [the] case and the language of the statute directing the court to determine whether a parent has supported, visited, or communicate [sic] with their child *when able to do so.*" (Emphasis in original.) *Id.*

**{¶56}** The credibility of the witnesses is highly relevant to this factor. The magistrate clearly believed father and mother when they testified that they missed visitations because of work and transportation issues. The juvenile court had no basis for overruling the magistrate on those factual findings because the court did not hear any additional testimony. As the magistrate correctly pointed out, missing visitations for valid reasons should not be held against the parents. The juvenile court's finding regarding R.C. 2151.414(E)(4) was not supported by clear-and-convincing evidence.

{¶57} Under R.C. 2151.414(E)(8), the juvenile court considered whether the parents repeatedly withheld medical treatment or food from the children when they had the means to provide the treatment or food. The court held that the parents had withheld medical treatment for S.D.'s seizures.

{¶58} It is undisputed that while in the parents' care S.D. was having approximately one seizure a week, and that since being placed in foster care and receiving medical treatment, she had only one seizure, and that was over two years before trial.

{¶59} Pederson testified that although the parents said that they took S.D. to the hospital, they have no understanding of what further treatment is needed or what S.D.'s medical needs are. Mother testified that they took S.D. to Children's Hospital many times, but that the hospital sent them away without seeing S.D. Adams testified that father told her the same thing early in the case, that they had taken S.D. to the hospital, but that the hospital did not treat her. Both mother and father testified that if S.D. was returned to their care, they would seek medical care for S.D.'s condition.

{¶60} The condition in R.C. 2151.414(E)(8) is not satisfied by the mere existence of a child's medical conditions where there was no evidence in the record that the parents actually withheld medical treatment. *In re B.H.,* 12th Dist. Fayette No. CA2008-06-019, 2009-Ohio-286, ¶ 29.

{¶61} HCJFS established that the parents knew that S.D. had a medical condition, but it failed to establish that they withheld medical treatment. In fact, the parents' testimony pointed to the opposite—that they sought treatment numerous

times but were turned away. The juvenile court's finding was not supported by clear-and-convincing evidence.

{¶62} Under R.C. 2151.414(E)(14), the juvenile court considered whether the parents were unwilling to provide food, clothing, shelter, and other basic necessities for the children or to prevent the children from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶63} The juvenile court found that the condition in R.C. 2151.414(E)(14) was satisfied because the parents did not consistently attend S.D.'s school or medical appointments, and, although the parents have adequate income, they did not provide money, food, or clothing to the children while in foster care.

{¶64} This court has previously questioned the applicability of R.C. 2151.414(E)(14) once a child is placed in the custody of HCJFS. *See In re P.,* 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 31 ("It follows that the R.C. 2151.414(E)(14) condition does not apply once the child is taken into the custody of HCJFS, since at that point the child's basic necessities are being provided for by HCJFS."). However, in *In re P.,* there was an issue as to whether the parent had the ability to provide food and other necessities, which is not at issue in the present case.

{¶65} Adams testified that the parents were invited to a meeting at the hospital regarding S.D. Mother attempted to attend the meeting, but went to the wrong hospital. This appears to have been an honest mistake, and should not have been held against the parents. Pederson testified that the parents were invited to "several" school meetings regarding S.D.'s individualized education plan ("IEP"), but only attended one. Adams's and Pederson's testimony failed to establish that the parents were *unwilling* to provide basic necessities for the children.

21

{¶66} This case is dissimilar to other cases in which the R.C. 2151.414(E)(14) condition was found to be satisfied. *See, e.g., In re Dylan R.,* 6th Dist. Lucas No. L-021267, 2003-Ohio-69, ¶ 11 (the parents used what little money they had to purchase a video-game console instead of paying rent); *In re Briazanna G.,* 6th Dist. Lucas No. L-04-1366, 2005-Ohio-3206, ¶ 5 (the parents sold WIC supplies for money to buy drugs, depriving their child of basic necessities such as food). Although the parents may not have provided money or clothing for the children while they were in foster care, they routinely brought food to visitations. There is no indication that the children were in need of any clothes or money while in foster care, or that their basic needs were not being met. The juvenile court's finding was not supported by clear-and-convincing evidence.

{¶67} Under R.C. 2151.414(E)(15), the juvenile court considered whether the parents

committed abuse as described in section 2151.031 of the Revised Code against a child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶68} The juvenile court found that the likelihood of recurrence of abuse or neglect made placement with the parents a threat to the children's safety. As discussed above, not only was the evidence of domestic abuse weak, HCJFS failed to prove that domestic abuse was an ongoing concern or that it was likely to recur.

{¶69} Regarding neglect, the caseworkers and GAL testified that they were concerned that if the children were returned to the parents, they would rely on S.D. to care for the other children. Mother testified that she never left S.D. alone to watch R.D. despite clear evidence to the contrary. Father initially testified that he had no idea why the children were removed, only to later testify that the children were removed because he and mother had made a mistake and left S.D. home alone.

{¶70} However, mother testified that if the children were returned to her and father, she would not use S.D. to supervise the other children. She testified that she would stay home to care for the children, and that she has family to help her—her father, siblings, uncles, and cousins. Both parents insisted that they would take S.D. to her medical appointments and ensure that she received treatment.

{¶71} Regarding S.D.'s education, the parents denied not sending S.D. to school despite the fact that she had missed ten of 19 school days by September 14, 2016. Mother testified that she did not understand what an IEP was or what services S.D. was receiving as a result. Nevertheless, while failure to send a child to school may very well threaten the child's growth and well-being, it does not present a "threat to the child's safety." *See* R.C. 2151.414(E)(15). Furthermore, both parents testified that education was important and that they would ensure that S.D. went to school, and Francesconi admitted at trial that both parents responded "appropriately" when asked about the children's schooling.

{¶72} The parents' testimony was somewhat inconsistent, but there was little evidence presented to support the court's finding that neglect was likely to recur, or that it would threaten the children's safety. "A decision based on clear and convincing evidence requires overwhelming facts, not the mere calculation of future

probabilities." *In re Williams*, 11th Dist. Geauga Nos. 2003-G-2498 and 2003-G-2499, 2003-Ohio-3550, ¶ 45. The court's finding that the R.C. 2151.414(E)(15) condition was satisfied was not based upon clear-and-convincing evidence.

{¶73} With none of the conditions in R.C. 2151.414(E) satisfied, the court erred in holding that the children could not be placed with the parents within a reasonable time and should not be placed with the parents. The 12-in-22 condition was satisfied as to S.D., R.D., and J.D., but not M.D. Thus, we do not reach the best-interest prong of the permanent-custody test regarding M.D., but we must continue our analysis for S.D., R.D., and J.D.

### The Second Prong—R.C. 2151.414(d)(1) best-interest analysis

{¶74} Under the second prong, the juvenile court must determine whether granting permanent custody to HCJFS is in the best interest of the children. R.C. 2151.414(B)(1). Pursuant to R.C. 2151.414(D)(1), the court may find that permanent custody is in the best interest of the children upon consideration of all relevant factors, including:

(a) the children's relationships with the parents, siblings, foster caregivers, and any other person who may significantly affect the children,

(b) the wishes of the children, with consideration granted for their maturity,

(c) the custodial history of the children, including whether the children have been in the custody of a public child services agency for 12 or more months in a consecutive 22 month period,

(d) the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to HCJFS, and

24

(e) whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and children.

{¶75} No single factor is given greater weight or heightened significance. *In re P.,* 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 35.

{¶76} The magistrate held that the R.C. 2151.414(D)(1)(a) factor favored returning the children to the parents due to the positive nature of the children's interactions with the parents during visitations. The juvenile court found that the children were bonded with each other, with the foster family, and with their parents. But, it disagreed with the magistrate, and held that the R.C. 2151.414(D)(1)(a) factor favored granting permanent custody to HCJFS.

{¶77} The HCJFS caseworkers and Pederson testified that all of the children are doing well in the foster home and are bonded to the foster family. S.D.'s therapist Morgan Roberts testified that S.D. described her foster family as her family. Pederson testified that when S.D. was removed from the home, she was behind developmentally and academically and had trouble communicating her wants and needs. She testified that since being placed with the foster family, S.D. has become more outgoing and energetic, is engaged in many activities, and is bonded with the foster family. The foster mother testified that S.D. would appear sad and irritable before and after visits with parents. She also testified that R.D. has become much more talkative and playful than when he first came into the foster home.

{¶78} It is important to note that father speaks some English, but mother does not speak any English. The children are in an English-speaking foster home, and although the parents have taught R.D. and J.D. some Spanish, they do not have the ability to communicate effectively with the parents in Spanish. The longer S.D.

has been in the foster home, the less she has wanted to speak Spanish with her parents, and her ability to speak and understand Spanish has degraded. Interpreters were present at all visitations in order to facilitate communication between the parents and the children. In spite of the language barrier, the FNC visitation notes describe many instances of loving interaction between the parents and the children.

{¶79} There is a strong bond between the parents and the children, and there is a strong bond between the foster family and the children. With the evidence cutting both ways, the R.C. 2151.414(D)(1)(a) factor does not weigh heavily in favor of either side.

{¶80} Under R.C. 2151.414(D)(1)(b), the juvenile court found that S.D. wished to remain with the foster family, and that the three younger children were too young to express their wishes. Pederson and Roberts testified that S.D. wished to stay with the foster family and be adopted by them. However, there is evidence in the record that as of April 2017, S.D. wanted to live with her parents. The longer she remained in the foster home, the more she wanted to permanently remain with the foster family. We must also remember that S.D. was only 11 years old at the time of trial. We agree with the magistrate and the juvenile court that the evidence showed that the children are bonded and it is in their best interest to keep them together. Therefore, to the extent that S.D.'s wish to remain with the foster family contradicts what is in the best interest of the remaining children, the importance of keeping the children together is paramount.

{¶81} As discussed above, the 12-in-22 condition is satisfied as to S.D., R.D., and J.D. Also, the children have been in their current foster home since March 2017.

{¶82} Under R.C. 2151.414(D)(1)(d), the court considered whether a legally secure permanent placement could be achieved without granting permanent custody to HCJFS. A legally secure permanent placement "is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 42, quoting *Matter of K.W.,* 2018-Ohio-1933, 111 N.E.3d 368, ¶ 87 (4th Dist.2018).

{¶83} The magistrate held that a legally secure permanent placement could be achieved by returning the children to the parents. The magistrate found,

Parents [sic] situation appears to be different from 2016: parents have complied with court orders, and mother does not work, so there will be proper supervision, and father has completed extensive anger management and domestic violence awareness, even though there was no proof at Trial of any physical or verbal altercations between parents.

{¶84} The juvenile court disagreed. It found that the parents do not understand the needs of the children, do not have the ability to supervise the children appropriately, and never provided HCJFS with proof of stable income or housing.

{¶85} The court's concerns regarding stable housing stem from the parents' failure to provide HCJFS with a copy of the lease agreement for the apartment they live in, and a visit to the apartment by Pederson in May 2018, during which the electricity was shut off and mother had to go around to the back of the building to retrieve the keys in order to enter. Pederson testified that she did not inquire as to why the keys were behind the building, and that father told her that the electricity

was shut off due to construction in the building. Regardless, Francesconi visited the home three times in the three months leading up to trial and testified that the housing was stable and appropriate. It is clear from her testimony that the parents' housing, whatever its condition in May 2018, is now appropriate.

{¶86} The caseworkers testified that they repeatedly asked the parents for a copy of the lease and verification of father's income, but never received anything despite father reassuring them multiple times that he would acquire the requested documents. Pederson testified that father also refused to give her any information about his income. Mother was charged with theft in May 2019, but there are no details in the record concerning this charge, and mother indicated that the case has been resolved. Francesconi testified that although she was never able to verify father's income, the parents never asked HCJFS for help financially, and she did not have concerns about the parents' ability to provide financially for the children.

{¶87} When asked about the lease, father testified that he and mother had been living in their current apartment for over a year, and that he had not provided HCJFS with a copy of the lease because he had not had a chance to pick it up from the landlord. Regarding income, he testified that he had asked his employer for documents verifying his employment, but the employer refused to provide them.

{¶88} Although the parents may have failed to adequately explain their repeated failures to provide HCJFS with a copy of the lease agreement, failure to provide a lease agreement cannot alone justify the court's finding that the parents lacked stable housing, especially not when father testified that they had been living in the same apartment for over a year prior to trial, and Francesconi testified that the parents' housing at the time of trial was appropriate. Also, despite father's erratic

work schedule, HCJFS has not shown that the parents cannot financially provide for the children. A lack of financial support was not cited as one of the reasons the children were initially removed from the home. The parents brought food to every visitation, they have maintained stable housing, and they have acquired furniture and clothing in preparation for the children's return.

{¶89} The juvenile court's findings that the parents do not have stable housing or income are not supported by clear-and-convincing evidence. Also, as discussed above under the sections concerning R.C. 2151.414(E)(1) and (15), there was not clear-and-convincing evidence presented to support the court's findings that the parents do not understand the needs of the children and do not have the ability to properly supervise them. Therefore, the juvenile court's finding that the parents cannot provide a legally secure permanent placement was not supported by clear-and-convincing evidence.

{¶90} R.C. 2151.414(D)(1)(e) directs us to R.C. 2151.414(E)(7)-(11) to determine if any of those conditions apply. In its best-interest analysis, the juvenile court stated that none of the R.C. 2151.414(E)(7)-(11) factors apply, contrary to its finding a few pages earlier that the condition in R.C. 2151.414(E)(8) was satisfied. Regardless, as discussed above, there was not clear-and-convincing evidence presented to support the court's finding that the condition in R.C. 2151.414(E)(8) was satisfied.

{¶91} The court's holding that granting permanent custody to HCJFS was in the best interest of the children was not supported by clear-and-convincing evidence.

29

### *Conclusion*

**{¶92}** This is an extremely difficult case. Termination of parental rights is an alternative of last resort and is only justified when it is necessary for the welfare of the children. The juvenile court's decision to permanently terminate the parents' parental rights boiled down to their failure to consistently acknowledge why the children were taken away, failure to communicate effectively with HCJFS, failure to articulate what they learned in their classes to the satisfaction of the court, and their inconsistent attendance at visitations. Mother and father are not perfect parents. But, it is clear from the record that although they made mistakes in raising their two oldest children, they love and care for their children and strive to be better parents. As explained above, after a thorough review of the record, we hold that HCJFS did not present clear-and-convincing evidence in support of its motion for permanent custody. We further hold that the juvenile court's judgment was not supported by sufficient evidence and was against the manifest weight of the evidence.

**{¶93}** Mother's and father's assignments of error are sustained. The judgment of the juvenile court is reversed and the cause is remanded with instructions to the juvenile court to issue a judgment entry adopting the magistrate's decision awarding legal custody of the children to their parents with protective supervision of M.D. by HCJFS.

Judgment reversed and cause remanded.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.