[Cite as *In re L.D.*, 2026-Ohio-546.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: L.D. and H.D.    :    APPEAL NO.   C-250607
                             TRIAL NO.    F/23/530 X

                        :

                        :

                        :    *JUDGMENT ENTRY*


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 2/18/2026 per order of the court.**


**By:**_____
          **Administrative Judge**

[Cite as *In re L.D.*, 2026-Ohio-546.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: L.D. and H.D. | : | APPEAL NO. | C-250607 |
| | | TRIAL NO. | F/23/530 X |
| | : | | |
| | : | | |
| | : | *OPINION* | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 18, 2026

*Alana Van Gundy*, for Appellant Mother,

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy A. Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Shawn Moore*, Appellee Guardian ad Litem for the minor children.

**MOORE, Judge.**

{¶1} Appellant Mother appeals the Hamilton County Juvenile Court's grant of permanent custody of her two children, L.D. and H.D., to the Hamilton County Department of Job and Family Services ("HCJFS"). In her sole assignment of error, Mother argues that the judgment of the court was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons set forth below, Mother's arguments are not well taken, and the judgment of the juvenile court is affirmed.

## I. Factual and Procedural History

### A. Pretrial

{¶2} At the heart of this appeal was a family of five: Mother, Father, and their three children. Only the family's two minor children, L.D., born in 2011, and H.D., born in 2014, are the focus of this case.

{¶3} On April 7, 2023, Father committed suicide. The next day, HCJFS filed an ex parte emergency custody petition. HCJFS's affidavit in support stated that in 2022 Mother was involuntarily hospitalized at UC Medical Center for 31 days by the Hamilton County Probate Court. HCJFS noted that following Mother's release it had continued to observe Mother in an active state of psychosis. HCJFS's case remained open for six months before it closed its case upon concluding that the children were safe with Father because he was able to supervise Mother's visits with the children. The court granted the ex parte order, and the children were placed with their paternal grandparents.

{¶4} On June 2, 2023, HCJFS filed its initial case plan, which identified several concerns with Mother. These concerns included Mother's mental health, her ability to meet the children's needs, and her ability to provide a secure environment

for the children. The plan also requested that she complete a diagnostic assessment and engage with HCJFS. The magistrate adopted the case plan.

{¶5}    On July 6, 2023, the magistrate adjudicated L.D. and H.D. dependent. Among the considerations relied upon by the court was a stipulation that Mother was diagnosed with bipolar disorder, and that she was observed "to be in a state of active psychosis on multiple occasions."

{¶6}    On August 15, 2024, HCJFS filed a motion to modify temporary custody to permanent custody. The court set the matter for trial.

### *B. Trial*

{¶7}    Over the course of the trial, the magistrate heard from several witnesses, including Mother, the children's paternal grandmother ("Grandmother"), Shawn Moore, who served as the children's guardian ad litem, as well as Sara Cruz and Leah McKinney, two HCJFS caseworkers who had worked on the case from 2023 to 2025.

#### *1. Mother's Testimony*

{¶8}    Mother testified that she believed that she was ready for the children to come home. Mother said she was ready to provide for her children and that she wanted to get a home for the family. Mother, however, testified that her finances were limited, because she was disabled and could not work. Mother testified that she has applied for disability and Social Security benefits, and that she intended to apply for Temporary Assistance for Needy Families benefits when the children came home. While she awaited the outcome of her benefits claims, she has relied on her roommate to pay her rent and the financial contributions from her family to get by.

{¶9}    Mother also testified about her current housing. She explained that she lives with a male roommate and that she has rooms available for the children. Mother also testified that for several months in 2023, another roommate was in her home, and

that this man would drink, act erratically, and keep illicit substances in the home. Despite testifying she did not feel safe, she did not explain why this roommate was allowed to stay in her home for months.

{¶10} Mother also testified about her mental-health treatment. Mother testified that in May 2022 and February 2024 the probate court ordered that she be involuntarily hospitalized over concerns that she was a threat to herself and others. Mother insisted that doctors reached this conclusion because they were not aware that she had ADHD and PTSD, and that this lack of a baseline resulted in two misdiagnoses. Mother ultimately agreed that she was diagnosed with bipolar disorder by licensed medical professionals.

### 2. Mother's 2024 Hospitalization

{¶11} Several exhibits were introduced that had led up to Mother's 2024 hospitalization, including the audio recording from Mother's 9-1-1 calls and responding police officers' body-worn-camera ("BWC") footage. On the night of February 4, police were dispatched to Mother's home and asked if everything was okay. Mother stated that she intentionally set off her home's security system, and that the police and Women Helping Women were to escort Mother from her home to a safe undisclosed location that she would share with police on the way.

{¶12} Despite stating that she intentionally set off the alarm, Mother also believed that someone was hacking into her home's security system, but she was not sure who it was. When police asked Mother to clarify what exactly was going on, Mother explained that guns and money had gone missing and Father was responsible. Mother also claimed that several aggrieved parties were now out to get her since Father was gone. Mother called Women Helping Women, and after speaking with both Mother and one of the responding police officers, the operator informed Mother that

5

no escort was coming, and that Women Helping Women was planning on contacting her the following day.

{¶13} On February 5, Mother called 9-1-1 twice, and police visited her in the morning and afternoon. During the second call, Mother requested a security detail, explained that she would be wearing a blonde wig to feel safer, and that she would be taken to a safe place where she would see her children and that people would take care of them.

{¶14} Police returned to Mother's home and invited a social worker to speak with her. Mother reiterated that people were "out to get her" and that she was waiting on her escort. The social worker told police that she believed Mother was having a manic episode, and that she should be evaluated at a hospital. Mother agreed to be evaluated and was peacefully escorted to Christ Hospital.

{¶15} HCJFS also admitted Mother's hospital records from the visit. Mother underwent a psychiatric evaluation, which determined that she was having a manic episode and diagnosed her with bipolar disorder. Despite Mother stating on her intake form that she had no history of mental-health disorders, her attending doctor noted that a review of outside health records revealed that Mother was diagnosed with bipolar disorder in 2022. During her 2024 stay, Mother's records noted that her paranoia persisted, and that she believed that people with guns were out to kill her.

{¶16} Mother's YouTube videos were also played at trial. These videos displayed Mother acting erratically and at times paranoid.

### 3. Grandmother's Testimony

{¶17} Grandmother testified that the children are thriving in her care. Since being placed in her home, the children are doing fine in school, making friends, and living comfortably. Grandmother stated if provided the opportunity to adopt the

6

children, she would not hesitate. When asked if she would be willing to ensure that the children and Mother have a relationship, Grandmother provided a mixed response. Specifically, Grandmother explained that while H.D. continues to communicate with Mother, L.D. has remained adamant that he does not want a relationship with Mother. L.D. had only communicated with Mother once since being placed with Grandmother. Grandmother testified that if the children wish to have a relationship with Mother, she would not intervene, but she also would not force L.D. into doing something he was uncomfortable with.

*4. Leah McKinney's and Sara Cruz's Testimony*

**{¶18}** McKinney testified that she was the case manager from July 2023 until August 2024. She expressed concern over Mother's failure to be candid with her about Mother's 2024 hospitalization, as well as with her lack of familiarity with Mother's roommate.

**{¶19}** Cruz assisted with the case from 2024 to the present. Cruz recalled several concerns with Mother, one being that she was unable to process her for a diagnostic assessment of functioning. While Mother signed three releases of information, Mother modified these releases, which limited HCJFS's ability to verify what mental-health services Mother was involved in. Cruz testified that as a result she was unable to speak freely with Mother's mental-health care providers.

**{¶20}** Like McKinney, Cruz had concerns with the children living with Mother. These include that HCJFS was unfamiliar with Mother's roommate, that Mother was unable to remove someone from the home who made her feel unsafe and engaged in illicit behavior, and that Mother provided no proof of income. HCJFS's primary concern with Mother was her mental health, but Mother remained insistent that she was not bipolar. Cruz testified that she wanted to see a behavioral change in Mother

that would indicate that she could handle her manic episodes safely and that she did not pose a risk to the children or herself. Cruz, however, testified that she has not yet seen this change.

**{¶21}** Both McKinney and Cruz testified that granting permanent custody to HCJFS would be in the children's best interest.

### 5. *Shawn Moore's Testimony*

**{¶22}** Moore testified that he had served as the children's guardian ad litem since April 2023. Based on his interactions with Mother, Moore believed that Mother was not candid about her mental health. He recalled that Mother offered several explanations for her 2024 hospitalization, including that she was not feeling well, that she could not afford her medication, that she was starving, and that the real reason would "come out in trial." Moore also recalled that Mother believed that it was either the other roommate, members of Father's family, or the gangs in the neighborhood that had hacked her security system.

**{¶23}** Moore's concerns with Mother extended beyond her 2024 hospitalization. Moore recalled several troubling allegations made by Mother, including that members of Father's family wanted to kill her and that they were abusing the children. While according to Moore Mother refused to share the evidence, she claimed that she kept undeveloped film that if developed would supposedly show Father engaged in a sexual act with a minor. Mother also claimed to be keeping what she believed to be a stick of dynamite, which was actually just a road flare, inside of her home. Moore expressed concern that he could not verify Mother's participation in mental-health services.

**{¶24}** Moore testified that given Mother's remarks, the uncertainty surrounding her mental health, and her financial and food insecurity, he believed that

8

it was in the children's best interest to remain in their current kinship placement and that permanent custody be granted to HCJFS.

## C. Post-Trial Motions and Entries

**{¶25}** On May 19, 2025, the magistrate granted permanent custody to HCJFS. In the magistrate's entry, she noted that the children were in agency custody for more than 12 months during a 22-month period, pursuant to R.C. 2151.414(B). The magistrate went on to find that the children could not be placed with Mother in a reasonable time because Mother failed to stabilize her mental health and therefore failed to remedy what prompted the children's removal from the home. R.C. 2151.414(E)(1). The magistrate also noted that Mother could not provide a permanent home for the children within one year. R.C. 2151.414(E)(2).

**{¶26}** The magistrate then assessed factors in R.C. 2151.414(D)(1)(a)-(e) and concluded that permanent custody to HCJFS was in the children's best interest. Considering the (D)(1)(a) factor, the children's interaction with family, the magistrate noted that the children are bonded with their grandparents and that L.D. has refused to contact Mother for two years. While H.D. is bonded to Mother, the magistrate noted that this bond is secondary to the evidence that Mother has failed to remedy her profound mental-health issues. Likewise, under the (D)(1)(b) factor, the children's wishes, the magistrate noted that both children wish to remain with their grandparents. When considering the (D)(1)(c) and (D)(1)(d) factors, the custodial history and the children's need for a secure placement, the magistrate stated that it is statutorily impossible to prolong HCJFS's temporary custody, and that the only way a secure placement could be achieved was by granting HCJFS permanent custody. The magistrate further concluded that the considerations underlying the (D)(1)(e) factor were inapplicable. The magistrate recognized that Mother clearly loves her children,

9

but that it is equally clear that she has not adequately treated her mental-health disorders, and as a result, the children cannot be reunited with Mother.

**{¶27}** Mother and Mother's guardian ad litem timely objected and argued that the magistrate's decision was against the manifest weight of the evidence. The court took written arguments from the parties in response to the objections, and upon completion of an independent review of the record, affirmed and adopted the magistrate's decision.

**{¶28}** This appeal followed.

## II. Analysis

### A. Sufficiency and Manifest Weight

**{¶29}** In her sole assignment of error, Mother argues the court's grant of permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence.

**{¶30}** In reviewing a juvenile court's decision terminating parental rights under R.C. 2151.414, the court applies a sufficiency-of-the-evidence and/or a manifest-weight standard of review, in accordance with the arguments raised. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. These are distinct concepts, as a sufficiency challenge attacks whether a party met its burden of production, whereas a manifest-weight challenge disputes whether a party satisfied its burden of persuasion. *State v. Messenger*, 2022-Ohio-4562, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

**{¶31}** When faced with a sufficiency challenge, we must independently review the evidence to determine if the court's decision is supported by clear and convincing evidence. *In re C/S Children*, 2025-Ohio-1639, ¶ 32 (1st Dist.), citing *In re K.D.*, 2024-Ohio-5582, ¶ 48 (1st Dist.). "Clear and convincing evidence is evidence sufficient to

produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.*, quoting *In re Ar. L.*, 2024-Ohio-231, ¶ 24 (1st Dist.).

**{¶32}** By contrast, when reviewing a manifest-weight challenge, we must "[weigh] the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether—in resolving the conflicts in the evidence—the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re Ar. L.* at ¶ 25.

**{¶33}** R.C. 2151.414(B)(1) establishes that for a juvenile court to award permanent custody to the state agency, the court must make two findings. *C/S Children* at ¶ 34, citing *Ar. L.* at ¶ 26. The court must first determine if one of the R.C. 2151.414(B)(1)(a)-(e) factors applies and then assess whether permanent custody is in the child's best interest under R.C. 2151.414(D)(1)(a)-(e).

**{¶34}** However, Mother does not take issue with any single statutory finding by the court, nor does Mother cite any case law in furtherance of her arguments. Instead, Mother supports her sole assignment of error with what we categorize as procedural and evidentiary issues. We first review Mother's arguments and then assess the court's application of the R.C. 2151.414(B) and (D) factors.

*1. Alleged Procedural Errors*

**{¶35}** Mother argues three procedural defects occurred at trial. These include HCJFS's failures to refer Mother for a diagnostic assessment of function, to comply with a court order to place L.D. and H.D. in therapy, and to make reasonable efforts to reunite the family. However, because Mother has solely framed her assignment of error as sufficiency and manifest-weight challenges, we are limited to assessing whether these arguments demonstrate that the juvenile court's grant of permanent custody was not supported by sufficient evidence or was against the manifest weight

of the evidence. As an appellate court, we pass judgment on assignments of error, "not mere arguments." *State v. Lear*, 2023-Ohio-3442, ¶ 17 (1st Dist.), citing *Mun. Tax Invest. LLC v. Northup Reinhardt Corp.*, 2019-Ohio-4867, ¶ 24 (10th Dist.). App.R. 12(A)(1)(b) obligates appellate courts to "determine the appeal on the merits on the assignments of error set forth in [the] brief." Mother did not identify how her procedural arguments relate to her sufficiency and manifest-weight challenges to the court's grant of permanent custody to HCJFS.

**{¶36}** To the extent that we interpret Mother's procedural arguments as relating to her sole assignment of error, her arguments are not persuasive. The court recognized that HCJFS expended diligent efforts to refer Mother, but her modifications to her releases of information delayed HCJFS's ability to refer Mother for treatment services. While Mother takes issue with HCJFS's failure to place the children in therapy, such a failure does not outweigh the abundance of evidence introduced at trial that the children's best interests were furthered by granting permanent custody to HCJFS.

### 2. *Alleged Evidentiary Errors*

**{¶37}** Mother raises two challenges: that there was insufficient evidence in the record to show that Mother's mental health would impact her ability to parent, and that the court erroneously admitted Mother's YouTube videos without first authenticating them. Mother does not identify how the court's alleged erroneous admission of evidence relates to her sufficiency and manifest-weight arguments under her assignment of error. Again, we endeavor to interpret Mother's challenge of alleged inadmissible evidence as supporting her sufficiency and manifest-weight challenges to the court's grant of permanent custody.

**{¶38}** Mother's first claim is not supported by the record. Mother stipulated

12

that she was involuntarily hospitalized and testified that she had been diagnosed with bipolar disorder. HCJFS offered and the magistrate admitted Mother's 2024 hospitalization record, which diagnosed Mother with "bipolar disorder, current episode manic severe with psychotic features," and recognized that she has previously been diagnosed with bipolar disorder. The children's guardian ad litem and HCJFS caseworkers testified they have real concerns with Mother's failure to manage her bipolar disorder and that this in turn would hamper her ability to provide a safe home for the children. While Mother takes issue with the absence of expert medical testimony concerning Mother's mental health, Mother fails to cite to any case law in support of her proposition that such testimony is required.

{¶39} As to Mother's claim concerning the admission of the YouTube videos, because Mother did not challenge the admission of the YouTube videos below, Mother waived all but plain-error review on appeal. *Kelley v. Horton,* 2025-Ohio-5252, ¶ 22 (1st Dist.), citing *Anders v. Seitz*, 2023-Ohio-668, ¶ 15, fn. 3 (12th Dist.). However, Mother has not raised a plain-error argument, and we decline to do so on her behalf. *See In re G.W.*, 2024-Ohio-1551, ¶ 24. We therefore decline to address the merits of Mother's evidentiary argument.

{¶40} Therefore, Mother's evidentiary arguments are not well taken.

### 3. Permanent-Custody Factors

{¶41} The record demonstrates that the children remained in agency custody for more than 12 months during a consecutive 22-month period, and thus R.C. 2151.414(B)(1)(d) was satisfied.

{¶42} Likewise, the court's best-interest analysis was supported by clear and convincing evidence as the R.C. 2151.414(D) factors weigh in favor of granting permanent custody to HCJFS. While Mother arguably has a relationship with one of

her children, both children wish to remain with Grandmother, and based on the duration the children remained in custody, the court could not prolong HCJFS's temporary custody. R.C. 2151.414(D)(1)(a)-(c).

**{¶43}** Further, and most importantly, Mother cannot satisfy the children's need for a legally secure placement. *See* R.C. 2151.414(D)(1)(d). While Mother insists that she has a home for the children to live in, secure placement is "more than a house with four walls." *See In re K.D.*, 2024-Ohio-5582, at ¶ 53 (1st Dist.), quoting *In re S.D.*, 2020-Ohio-3379, ¶ 82.

**{¶44}** While Mother may have a home for the children, Mother has been largely dismissive and in denial that she has bipolar disorder, despite twice being involuntarily hospitalized for manic episodes. Mother's own conduct has frustrated HCJFS's ability to refer her for mental-health services. The testimony from Mother, HCJFS caseworkers, and the children's guardian ad litem demonstrate that Mother has not managed her mental health. The record reflects that Mother has failed to adequately treat her mental health, which was the impetus for the children's removal from her home in the first place. By persistently being in denial about her condition, Mother has failed to demonstrate that if the children were to return to her home, she could provide a safe and secure home while responsibly managing her episodes.

**{¶45}** Beyond Mother's mental health, Mother offered no proof of income, had yet to receive a decision on her disability- and Social-Security-benefits claims, and is entirely reliant on the financial gifts of others to get by. Mother stated that she has not paid rent since 2022, and HCJFS caseworkers testified that they are unfamiliar with Mother's roommate. Further, the court was free to consider that Mother testified that she allowed another person to occupy her home, even though that person made her feel unsafe and kept illicit substances in the home.

**{¶46}** Because the juvenile court's grant of permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence, Mother's sole assignment of error is overruled.

### III. Conclusion

**{¶47}** The judgment of juvenile court is affirmed.

Judgment affirmed.

**ZAYAS, P.J.,** and **NESTOR, J.,** concur.